# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4516 | **DATE** | 8/26/2003 |
| **CASE TITLE** | | Savannah Herron vs. Jo Anne B. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐   Filed motion of [ use listing in "Motion" box above.]

(2)  ☐   Brief in support of motion due _____.

(3)  ☐   Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐   Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐   Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐   Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐   Trial[set for/re-set for] on _____ at _____.

(8)  ☐   [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐   This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10)  ■   [Other docket entry]   **ENTER MEMORANDUM OPINION AND ORDER.** Plaintiff's motion for summary judgment [doc. # 28] is granted. Defendant's motion for summary judgment [doc. # 30] is denied. This case is remanded for further consideration by the ALJ in line with this opinion.

(11)  ■   [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | **34** |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 8/26/2003 | |
| | JJK courtroom deputy's initials | | date mailed notice | |
| | | | JJK mailing deputy initials | |

CLERK U.S. DISTRICT COURT

03 AUG 27 AM 10: 27

FILED FOR DOCKETING

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DOCKETED

AUG 2 8 2003

SAVANNAH HERRON,                    )
                                    )
              Plaintiff,            )
                                    )          No. 02 C 4516
vs.                                 )
                                    )          Magistrate Judge Schenkier
JO ANNE BARNHART,                   )
Commissioner of Social Security,    )
                                    )
              Defendant.            )

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Savannah Herron, seeks judicial review of a final decision by the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her claim for Social Security Income ("SSI"). On August 5, 1998, Ms. Herron filed an application for SSI, alleging a disability beginning on July 20, 1997, caused by back pain (R. 20). The Agency found that Ms. Herron was not disabled, both initially and again upon reconsideration (R. 28-38).

On November 28, 2000, Ms. Herron, represented by counsel, appeared at a hearing before an Administrative Law Judge ("ALJ") (R. 232). Although some testimony was taken at the hearing, the hearing was ended before its completion because Ms. Herron's attorney indicated that a prior application for benefits and some medical records could not be located and were not before the ALJ. The ALJ agreed to leave the record open until those records could be located. After the prior application and a portion of the medical records were located, the ALJ held a supplemental hearing on August 2, 2001 (R. 303-47). The ALJ subsequently issued a written decision, dated September

---

[1]On November 13, 2002, by consent of the parties, this case was reassigned to this Court for all proceedings including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1 (doc. ## 18-20).

28, 2001, denying Ms. Herron SSI benefits (R. 19-27). Ms. Herron filed a Request for Review and, on April 26, 2002, the Appeals Council denied the request (R. 6-7). Therefore, the decision of the ALJ is the final decision of the Commissioner and is subject to judicial review by the district court. *See Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994). Ms. Herron subsequently filed a timely complaint in federal court seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Ms. Herron now seeks summary judgment reversing the Commissioner's decision denying her SSI or, in the alternative, remanding the case for further proceedings (doc. # 28). The Commissioner has filed a cross-motion for summary judgment to affirm the decision below (doc. #30). For the reasons stated below, the Court denies the Commissioner's motion for summary judgment and grants Ms. Herron's motion for summary judgment, remanding the case for further proceedings.

## I.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. We will set forth the claimant's personal and medical history first, followed by a summary of the administrative hearing testimony and the ALJ's written decision.

## A.

Ms. Herron was born on September 17, 1954, and was 47 years old at the time of the ALJ's decision (R. 94). She has a tenth grade education and is working on obtaining a generalized education degree (GED) (R. 262). Ms. Herron previously has been employed as a housekeeper, as

a skip tracer, and as a receptionist and stocker for a furniture company, but has not worked since May 1998 (R. 127-39).

Ms. Herron lives in a Section 8 housing apartment with her 19 year-old daughter (R. 259). With regard to her daily activities, Ms. Herron testified that her daughter has to help her tend to her personal care, but she is able to do household cleaning, and some cooking and shopping (R. 270-71). She also testified that she watches television, and that she is able to take public transportation (R. 271).

Ms. Herron states that she is currently unable to work due to back and neck pain she has experienced since sustaining an injury in 1997. The pain is located in the left side of the back, underneath the shoulder blade (R. 272). Additionally, Ms. Herron said that she has a sharp, agonizing pain in the center of her back, around the waistline (R. 281). Ms. Herron stated that the pain sometimes makes her restless. Ms. Herron stated that this pain occurs every other day and lasts all day (R. 283). She added that the pain affects her concentration, and causes forgetfulness (R. 21). Ms. Herron said that when the pain occurs, she stands up, or lies on a rug and rolls back and forth (R. 276). Ms. Herron testified that her pain is relieved by the medication Flexeril, which she takes three times per day (R. 283). But, she claims that the medication makes her very drowsy, so she does not always take it (*Id.*).

Ms. Herron said that she can sit for two hours and walk two blocks. She stated that if she worked, two 10-minute breaks and a 30-minute lunch would not be long enough for her to take her medication. Ms. Herron continues to see her treating physician, Dr. Shah. Before that, she had seen a chiropractor three times per week (R. 279). She said that she participated in physical therapy during all of 1999, but stopped when she lost her medical card (*Id.*).

3

**B.**

Ms. Herron claims disability due to back and neck pain resulting from an injury on July 20, 1997, when a portion of her bathroom ceiling fell on top of her (R. 102). The first relevant medical evidence available in the record dates back to 1975, when she underwent surgery for a back injury (R. 408-09). We will review the medical evidence in chronological order.

Ms. Herron underwent an exploratory lumbar laminectomy in 1975, for a stab wound to her lower back at L3-L4, and for spinal fluid leakage, *Id.*; *see also* Exhibit 1F. There is no medical evidence from 1975-97 in the record. Ms. Herron did develop back and neck pain, after part of her bathroom ceiling fell on her in July 1997 (R. 102). However, magnetic resonance imaging ("MRI") taken of the lumbar spine on September 9, 1997 failed to demonstrate a compression fracture or subluxation (R. 426). There was a loss of intervertebral disc height at the L3-L4 level and mild central disc bulging, but no evidence of the thecal sac decompression or asymmetry noted (*Id.*).

In August 1998, Ms. Herron's treating physician, Dr. Chad Larson, noted that the claimant's deep tendon reflexes were intact; there was no muscle atrophy; and the claimant's gait was normal without the use of an assistive device (R. 165-66). Ms. Herron had some decreased range of motion of the lumbar spine, with paravertebral muscle spasms (*Id.*). Dr. Larson also noted that prolonged standing, and performing lifting and/or carrying, could possibly be difficult for the claimant, although he did not specify any particular time or weight limitations (R. 166).

On September 17, 1998, Dr. Mai Phan, a state agency consulting physician, examined Ms. Herron and noted that she had decreased range of motion in her back, as well as in her neck and shoulder (R. 401-03). She also had a diminished grip of strength in the right hand, but she was otherwise neurologically intact (*Id.*). X-rays taken of the lumbar spine that day disclosed narrowing

4

of the L4-L5 intervertebral disc space (R. 405). The cervical spine showed moderately advanced degenerative changes in the mid-cervical spine, with degenerative disc pathology at the C4-C5 level (*Id.*).

An October 26, 1999 report by Dr. Jagdish Shah, Ms. Herron's current treating physician, showed that the claimant continued to have limitation of motion of the lumbar spine, with paravertebral muscle spasms and positive leg raising (R. 175-77). Dr. Shah noted that Ms. Herron's reflex and sensation were normal and that there was no evidence of nerve compression (R. 174). Dr. Shah also stated that the claimant would have decreased ability to stand, move about, and perform lifting and carrying, although he did not provide specific restrictions (R. 174-75). *Id.* The MRI taken of the lumbar spine at that time (1999) was normal (R. 188). Dr. Shah's report does not indicate that he made any RFC findings regarding the range of work that Ms. Herron could perform.

A state agency physician, Dr. Pilapil, made an RFC finding in 1999. Dr. Pilapil found that Ms. Herron had the RFC to perform a limited range of light work (R. 391-97). Specifically, Dr. Pilapil found that Ms. Herron could perform a limited range of light exertional work: she could lift and/or carry 20 pounds occasionally or 10 pounds frequently; sit for up to 6 hours in an 8-hour work day; stand and/or walk for up to 6 hours in an 8-hour work day; perform balancing, crouching, kneeling, and crawling frequently, and climbing and stooping occasionally (R. 392-93). There were no push and/or pull restrictions (*Id.* at 392).

Ms. Herron was hospitalized in early December 1999 for recurrent syncopal episodes (R. 178-79). The treating physician, Dr. Terry A. Zheutlin, reported that the claimant failed to show any structural heart disease or etiology for the episodes (*Id.* at 178). The claimant was discharged on an empiric antiarrhythmic therapy of low dose beta-blockade (*Id.*). At a follow-up examination weeks

later, the claimant reported being light-headed and dizzy, but had significant improvement in symptoms, and was functioning normally (R. 178). She reported some light-headedness when standing quickly, but stated that the symptoms stopped when she was seated (*Id.*).

Another state agency RFC evaluation was done on January 18, 2000, this one by Dr. Young-Ja Kim (R. 189-96). This evaluation, by Dr. Kim, recited two limitations not in the earlier RFC: no climbing (R. 192), and no work "around hazardous moving machinery or at unprotected heights (R. 193). Dr. Kim also commented that Ms. Herron was able to engage in "unassisted ambulation," and that her 1999 MRI was "normal" (R. 196).

On November 16, 2000, Dr. Shah prepared another evaluation of Ms. Herron's condition (R. 201-04). Dr. Shah opined that Ms. Herron could not stand, walk or sit upright for 6 hours of an 8-hour working day, but would need to lie down every two hours (R. 202). He further opined that she only could lift and carry less than 5 pounds frequently during a work day (*Id.*). He also stated that Ms. Herron would have problems bending, squatting and kneeling (R. 203).

Also, in November 2000, Ms. Herron began receiving treatment at a Cook County Hospital clinic (R. 205-17). Additional notes through December 2000 show that the claimant's condition of cardiac arrhythmia was stable without syncopal episodes for more than one year (*Id.*). Moreover, electrocardiogram results were normal (*Id.*). The notes also showed that the claimant continued to have decreased lumbar spine range of motion and paravertebral muscle spasms (*Id.*). Ms. Herron showed improvement when taking Flexeril (R. 213-15). Once the claimant began taking this medication, she had good results with pain relief and increased range of motion (R. 209). Ms. Herron reported being able to attend to her activities of daily living: she could shower, and she could move about without pain, but she had drowsiness as a side effect of taking her prescribed

medications *and* because she was taking more medication than was prescribed (R. 209). Ms. Herron acknowledged that she had increased the dosage on her own (without the approval of her doctor), apparently to relieve pain faster (*Id.*). Ms. Herron admitted that when she began taking her medication as directed, she had much less pain and drowsiness (R. 205). Her physician reduced her prescription of muscle relaxants to twice per day (*Id.*).

## C.

Ms. Herron initially appeared and testified at a hearing held before the ALJ on November 28, 2000 (R. 232). Besides hearing testimony from Ms. Herron, the ALJ heard testimony from a Medical Expert ("ME") and a Vocational Expert ("VE"). Ms. Herron then testified at a supplemental hearing held on August 2, 2001, and the ALJ heard testimony from a second ME, and he took further evidence from a different VE (R. 305-06). In this section, the Court will examine the testimony and evidence presented at both hearings.

### 1.

At the threshold, the Court notes that there is a dispute between the parties about missing MRI evidence (Pl.'s Mem. at 10; Def.'s Mem. at 9). Although the ALJ left the record open after the first hearing to locate Ms. Herron's missing prior application and medical records, at the supplemental hearing, Ms. Herron's attorney could only produce one page of the disputed MRI (taken on October 25 of an unknown year) (R. 321).[2] The ALJ and the claimant's attorney agreed to have the MRI page read into the record so that the ME, Dr. Newman, could render an opinion based on that evidence, which he did. Dr. Newman, after listening to the MRI evidence, offered the

---

[2]We note that one of the state agency RFC evaluations refers to an MRI dated October 25, 1999 (R. 196). Thus, we believe it reasonable to infer that the "October 25" MRI was taken in 1999.

opinion that the one page available to him was enough to render a medical opinion regarding Ms. Herron's claim of disability (R. 325).

The parties raise two issues regarding the missing MRI evidence: (1) whether Dr. Shah, Ms. Herron's treating physician, had the complete MRI before him as the basis for his opinion that the "claimant would have decreased ability to stand, move about, and perform lifting and carrying" *Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992); and (2) whether the opinions of the two MEs, Dr. Bianchin and Dr. Newman, were undermined by the lack of a complete MRI report. We briefly address each issue in turn now (although we will circle back to these issues later in this opinion).

*First*, the defendant correctly characterizes Ms. Herron's assertion that Dr. Shah's opinion "could have" been based, in part, on the MRI study as "speculative" (Def.'s Mem. at 9). There is no evidence in this record that Dr. Shah ever saw the MRI itself or made an independent examination of the MRI at issue. The only evidence of Dr. Shah's exposure to the MRI is that he received a report that the MRI was "normal" (R. 188).

*Second*, it was Ms. Herron's burden to produce evidence of her disability at Steps 1-4, which includes evidence of her residual functional capacity ("RFC"). *Young*, 957 F.2d at 389. If the complete MRI report was necessary to this determination, then the failure to produce the parts of the report that would favor Ms. Herron's claim of disability cuts against her, because the production of medical and vocational evidence that is used to determine Ms. Herron's RFC is Ms. Herron's burden at Steps 3 and 4. Ms. Herron's attorney, who read the available MRI evidence into the record, did not object to Dr. Newman rendering an opinion on the basis of that evidence. Nor did Ms. Herron's attorney cross-examine the ME on this point. Given this context, we find that Ms. Herron has

waived her objection to the ME's medical opinion based on any lack of completeness of the MRI evidence. *See Ragsdale v. Shalala*, 53 F.3d 816, 819 (7th Cir. 1995) (where claimant's attorney has opportunity to correct errors by expert, "[a]ny perceived insufficiencies are best addressed on cross-examination, not on appeal"). *See also Donahue v. Barnhart,* 279 F3d 441, 446 (7th Cir. 2002) (if claimant's attorney does not cross-examine expert on basis for opinion and discrepancy is later discovered, an ALJ is not obliged to reopen the record and can accept opinion as it stands).

With that threshold issue resolved, the Court will address the other substantive issues in this case. We begin with the testimony of the medical experts and move to the testimony of the VE.

**2.**

The ME who testified at the first hearing was Dr. James Bianchin, a board-certified orthopedist (R. 243). Dr. Bianchin began by testifying that the evidence showed that Ms. Herron did not have any neurological deficits, and that the one page report of the MRI taken in approximately October 1999 was normal (R. 244-45, 250). Dr. Bianchin also testified that the RFC assessment provided by Dr. Shah was not medically reasonable, because it was not supported by objective findings (R. 249). Dr. Bianchin reviewed the file on the current application and opined from the evidence that Ms. Herron had a severe back impairment, but she can stand and walk for 6 hours of an 8 eight hour day; she can lift and carry 10 pounds frequently and 20 pounds occasionally; and she can reach above shoulder level, even though she has difficulty climbing heights and being around moving machinery (R. 250-52).

In summary, Dr. Bianchin stated that there was no evidence of any "objective findings" to support muscle weakness or deficiencies that would reduce Ms. Herron's exertional abilities to the

level established by Dr. Shah (R. 253-54). Dr. Bianchin agreed with the opinion of the state agency physicians that the claimant is capable of performing a limited range of light work (*Id.* at 250).

The ME who testified at the supplemental hearing was Dr. William Newman, who is also a board-certified orthopedist (R. 317). In response to Ms. Herron's attorney's cross-examination, Dr. Newman acknowledged that prescribed muscle relaxers can cause drowsiness, and that he advises his own patients to take these medications only when lying down (R. 332). However, he also indicated that Ms. Herron could simply take aspirin or Tylenol during the day, and that he usually instructs patients to take Flexeril when they are lying down, not during the day while they are at work (R. 333). Additionally, Dr. Newman testified that Ms. Herron would benefit from the use of a back brace (*Id.*).

Ms. Herron's attorney read the results from the one page of the MRI study, and Dr. Newman testified that this evidence showed that the MRI was normal. Dr. Newman also testified that medical evidence from x-rays that predated Ms. Herron's injury showed moderately severe spondylosis of the cervical spine, and a bulging disc at the L3 level (R. 324-25). Dr. Newman also testified that, post laminectomy, Ms. Herron had no evidence of impingement (R. 329-30). Additionally, Dr. Newman testified that Ms. Herron's syncopal episodes were not a result of a heart-related problem (R. 325-26).

Based on this evidence, Dr. Newman concluded that Ms. Herron could sit for six hours per day and for two hours at one time, stand and walk for six hours per day, lift and carry ten pounds frequently and 20 pounds occasionally, perform simple grasping and fine motor skills (R. 330-31). Like Dr. Bianchin, Dr. Newman also testified that the opinion by Dr. Shah was not reasonable because there was no evidence in the record which showed that his opinion was based on objective

medical findings (R. 318). In summary, after reviewing the objective evidence from both the prior and current files, Dr. Newman agreed with the opinions of the state agency consulting physicians and Dr. Bianchin that Ms. Herron retains the RFC to perform a limited range of light work (R. 330-31).

**3.**

The VE who testified at the first hearing was Dr. Hamersma. He testified that the claimant's recent work attempts as a receptionist and skip tracer were unskilled and required sedentary exertion (R. 301). According to the VE, the claimant's prior work as a receptionist/skip tracer would be jobs that required light exertion (*Id.*). Additionally, Dr. Hamersma testified that the claimant's jobs as a machine operator and housekeeper were unskilled and also required medium exertion (*Id.*). The VE concluded that the claimant did not acquire skills that would be transferable to other work (*Id.*).

The VE who testified at the supplemental hearing was Ms. Gianforte. Ms. Gianforte testified that Ms. Herron had two trial period work attempts as a cashier/receptionist and skip tracer (R. 342-43). However, Dr. Gianforte pointed out that the receptionist job did not satisfy the definition of substantial gainful activity because it lasted less than 3 months (*Id.*). Additionally, Dr. Gianforte noted that Ms. Herron's job as a skip tracer failed to satisfy the definition of substantial gainful activity (R. 343). The ALJ asked the VE about job possibilities for a hypothetical individual with Ms. Herron's vocational profile who could sit, stand, and walk for 6 out of 8 hours, frequently lift 10 pounds and occasionally 20 pounds, occasionally squat, crawl, climb, reach above shoulder level and bend, and who could not climb unprotected heights or be around moving machinery (R. 343-44). The VE testified that such an individual could perform jobs as an information clerk, receptionist, and bill or account collector (*Id.*).

The ALJ then asked the VE if the same hypothetical individual, needing a sit/stand option, could perform Ms. Herron's past relevant work (R. 344). The VE testified that there are some information clerks in a hospital setting, a cashier in a parking lot, and a counter clerk in a car rental agency that allow for a sit/stand option (*Id.*). The jobs that the VE identified existing in the Chicago metropolitan area, and the counties of Lake and Porter in Indiana are included: 1,500 information clerk positions; 2,500 parking lot cashiers; and 2,000 counter and rental clerk positions (R. 345). Additionally, the VE testified that these jobs would not be available if the individual needed to lie down and rest after sitting only two hours, or fell asleep for one or two hours after taking the medication in the morning (*Id.*).

**D.**

The ALJ issued his decision on September 28, 2001 (R.19-27). The ALJ applied the standard five-step sequential evaluation pursuant to 20 C.F.R. §§404.1520 and 416.920 (2002). At Step 1, the ALJ found that, although there was some evidence of work activity after the alleged onset date of July 20, 1997, it is not necessary to determine whether that work activity constitutes disqualifying substantial gainful activity, because there exists an independent basis for denying claimant's application (R. 20). Accordingly, the ALJ noted that there is no basis for denying Ms. Herron's application at the first step (R. 20). Next, at Step 2, the ALJ found that Ms. Herron's impairments of back pain and occasional spasms, meet the definition of "severe" (*Id.*). However, at Step 3 the ALJ determined that the record did not establish that Ms. Herron's condition is subject to any impairments or combination of impairments that meet or equal the specifications of an impairment listed in the Agency regulations (*Id.* at 21). In making this determination at Step 3, the ALJ found that Ms. Herron's condition did not satisfy the Step 3 standard after considering the entire record,

including the claimant's subjective complaints of disabling symptoms and limitations, and the opinions in the record (*Id.*).

After the Step 3 determination, the ALJ determined Ms. Herron's Residual Functional Capacity ("RFC") (R. 21-24). In addressing Ms. Herron's testimony, the ALJ noted that Ms. Herron's allegations of disabling symptoms and limitations were generally credible, but not to the extent alleged (R. 23). Moreover, the ALJ noted that the testimony of Ms. Lena Herron (claimant's sister) confirmed Ms. Herron's testimony in a "vague and generalized manner" and was not persuasive in establishing a disabling condition since July 1997 (*Id.*).

Next, the ALJ considered evidence of the claimant's complaints of drowsiness and noted that, when Ms. Herron started taking her medication as directed, her complaints of drowsiness decreased (R. 24). Furthermore, the ALJ found that Ms. Herron had not had a syncopal episode for more than a one-year period (*Id.*). The ALJ agreed with the opinions of the state agency physicians, and the opinions of Dr. Bianchin and Dr. Newman, that Ms. Herron retained the capacity to perform a limited range of light work (*Id.*). The ALJ concluded that Ms. Herron's impairments preclude only the following work-related activities: lifting and/or carrying, or pushing and/or pulling more than 20 pounds occasionally or 10 pounds frequently; sitting more than six hours in a eight hour day; performing activities such as reaching, balancing, bending, stooping, crouching, kneeling, and crawling more than occasionally; climbing ropes, scaffolds, and ladders; and working with or near dangerous moving machinery, and at unprotected heights (R. 26). In addition, the ALJ found that Ms. Herron must be allowed the option to alternate between sitting and standing (*Id.*).

After assessing Ms. Herron's RFC at Step 4, the ALJ determined that Ms. Herron is capable of performing her past relevant work as a receptionist or skip tracer, with an RFC for a limited range

13

of light work (R. 25, 26). Additionally, the ALJ found that the claimant's job as a receptionist/clerk could be performed with a sit/stand option, and that this RFC would also allow her to perform past relevant work as a skip tracer. *Id.*

The ALJ then determined at Step 5 that Ms. Herron was not disabled. To reach this conclusion, the ALJ relied on the answer that the VE gave to a hypothetical individual with Ms. Herron's RFC limitations.[3] The VE identified that such an individual could perform a substantial number of jobs in the regional economy (R. 345). The ALJ concluded, based on this testimony, that Ms. Herron could perform the sedentary job of receptionist which includes 1,500 reception jobs in the Chicago metropolitan area, and the counties of Lake and Porter, in Indiana (R. 25, 26). The ALJ also found that "the claimant has a limited education (20 C.F.R. 404.1564/ 416.964), and in view of the claimant's vocational characteristics and residual functional capacity, no Medical-Vocational Rule applies directly. "However, using Medical Vocational rule 202.21 as a framework for decision-making, as supplemented by the testimony of the vocational expert, a conclusion is warranted that the claimant can perform jobs existing in significant numbers in the economy" (R. 26). The ALJ therefore found that Ms. Herron was not disabled at Step 5 (R. 25, 26).

## II.

To establish a "disability" under the Social Security Act (the "Act"), a claimant must show an "inability to engage in a substantial gainful activity by reason of any medically determinable

---

[3] The Court notes that at the supplemental hearing the VE was not asked in the ALJ's hypothetical about Ms. Herron's non-exertional limitations (*e.g.*, her skill level). Nor did Ms. Herron's attorney, who was present at the hearing, cross-examine the VE on this basis when the VE opined that Ms. Herron could perform three categories of jobs that exist in numbers ranging in the thousands. The Court finds that the ALJ's reliance on the VE's testimony was warranted because: (1) the non-exertional skill level and education evidence was before the VE, both through the testimony of Ms. Herron at both hearings (R. 262, 339) and from the VE's testimony in the first hearing (R. 301); and (2) Ms. Herron's attorney failed to cross-examine the second VE regarding Ms. Herron's skill level.

14

physical or mental impairment which can be expected to result in death or which has lasted for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(A)(2002). A claimant must demonstrate that her impairments prevent her from performing not only past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2002). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairments meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see Young v. Secretary of Health and Human Services,* 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's residual functional capacity to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(e). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work in the national economy (other than the relevant past employment). *See Bowen v. Yuckert,* 482 U.S. 137, 142 (1987); 20 C.F.R. § 1520(f).

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g)(2002), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether the claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has authority to assess medical evidence and give a greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *See Ehrhart v. Sec'y of Heath and Human Services*, 969 F.2d 534, 538 (7th Cir.1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen,*782 F.2d 79, 83 (7th Cir.1986)(per curiam).

However, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss all evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102,

16

at *9 (N.D. Ill. March 3, 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F. 3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

Ms. Herron challenges the ALJ's determinations at Steps 4 and 5. We address each of those determinations in turn.

### III.

Ms. Herron challenges the ALJ's Step 4 determination, in which the ALJ found that Ms. Herron was able to perform her past relevant work as a receptionist or a skip tracer, with a RFC capacity for light work (Pl.'s Mem. at 13-14). The Commissioner has not attempted to defend the Step 4 vocational finding, and has effectively conceded it was erroneous. Instead, the Commissioner argues that "even if [p]laintiff is correct, that her past work as a skip tracer and receptionist . . . did not qualify as past relevant work, the ALJ also found [p]laintiff could perform a significant number of other jobs" at Step 5 (Def.'s Mem. at 13).

However, the Commissioner's concession does not eliminate an issue embedded both in the Step 4 finding that Ms. Herron could perform her past work, and in the Step 5 finding that there were other jobs insignificant numbers in the economy that she could perform: that is, the ALJ's RFC determination that Ms. Herron maintains the ability to perform a certain range of light work. Ms. Herron claims that the ALJ's determination on this point failed to properly consider the side effects of her medication (Pl.'s Mem. at 7-8), and also ignores the opinions of her most recent treating physician, Dr. Shah, and testimony from Ms. Herron and her friends and relatives concerning her physical limitations (Pl.'s Mem. at 9). We focus on this first challenge, which we find requires a remand here.

### A.

Ms. Herron's treating physicians have prescribed two muscle relaxants to help relieve her back pain: Flexeril (cyclobenzaprine) and Robaxin (methocarbanol). Ms. Herron testified that when she takes these medications, she becomes very drowsy and has to lie down for up to two hours (R. 276, 315). And, the record shows that Ms. Herron in fact has complained of this side effect to her doctors (R. 205, 209, 314). Dr. Shah, a treating doctor, confirmed that Ms. Herron must lie down during the day for muscle relaxation (R. 202). And, a medical expert at the second hearing, Dr. Newman, confirmed that these medications do cause drowsiness and admitted that he advises his patients only to take Flexeril when lying down, not during the day (R. 332).

The ALJ acknowledged this evidence, but found that it did not warrant a more restrictive RFC for three reasons: (1) that Ms. Herron's drowsiness problem "improved when she started taking her medication as directed," (2) that her dizziness "occurred primarily when standing quickly, and stopped with seated," and (3) that, if the purpose of lying down after taking the medication was "to

avoid dizziness (even nausea)," then there was no reason the claimant could not take her medication during a break or lunch period, without disrupting her work schedule (R. 24). We find the ALJ's analysis fails to build "a logical bridge from the evidence to [the] conclusion," *Zurawski*, 245 F.3d at 887, for several reasons.

*First*, while there is substantial evidence in the record that Ms. Herron's drowsiness problem diminished when she took her medication at prescribed, there is no evidence that drowsiness abated entirely. And, indeed, Dr. Newman's testimony indicated that even taken as directed, the muscle relaxers that Ms. Herron takes cause such level of drowsiness that he advises his patients to take them only while they are lying down, and not during the day when they are active (R. 332).

*Second*, the ALJ's reference to Ms. Herron's problems with dizziness (R. 24 and Ex. 5F) improperly conflates two distinct medical conditions: Ms. Herron's drowsiness caused by her pain medication, and the separate problem of dizziness that was associated with past syncopal episodes. The reference to dizziness from this separate condition (which no longer appears to be an issue for Ms. Herron) fails to shed light on Ms. Herron's RFC when considering drowsiness caused by pain medication.

*Third*, the ALJ's question about why Ms. Herron could not take the medication during a break or lunch period without disrupting her work schedule was a reasonable one. The problem is the ALJ improperly assumed the answer: that the medication could be taken at one of those times without disrupting a work schedule. The ALJ found that Ms. Herron had not indicated that it would be inconvenient to take the medication during breaks, and stated that it would be "dangerous" to take Dr. Newman's testimony as indicating to the contrary since his testimony concerning the need to lay down when taking the medication was offered "without elaboration" (R. 24). However, the question

19

that elicited Dr. Newman's testimony was asked by the ALJ; thus, any failure to elaborate is the result of the ALJ and not Ms. Herron's attorney, to ask the next question. Moreover, the ALJ's assumption is particularly questionable because Dr. Newman's testimony suggests that the drowsiness caused by Flexeril well might extend beyond a break or lunch period. Dr. Newman testified that "when I prescribe Flexeril I usually tell them to take it when they are going to lay down, not during the day. So they – I would not recommend Flexeril if you take it when you're active or driving a car or doing anything like that" (R. 332). In these circumstances, we do not believe that the ALJ properly could assume that Dr. Newman would have offered testimony adverse to Ms. Herron on this point had the ALJ asked the follow-up question.

The Commissioner seeks to bolster the ALJ's conclusion that drowsiness would not interfere with Ms. Herron's ability to work by citing to Dr. Newman's testimony that during the work day, Ms. Herron could take aspirin or Tylenol instead of Flexeril (Def.'s Mem. at 6; R. 333). However, the ALJ did not cite this testimony as a basis for his determination of Ms. Herron's RFC. We do not know whether the ALJ failed to cite that testimony because he simply forgot, or because he did not find it persuasive.[4] Moreover, in determining whether the ALJ builds a "logical bridge" that discloses his reasoning, we must assess the *ALJ's* reasoning. We therefore decline the Commissioner's invitation to consider the ALJ's determination based on a decision that he did not write, rather than on the one he wrote. *See, e.g., Grove v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (where ALJ could go either way based on evidence, but "fails to build a bridge from the evidence

---

[4]We do note that the ALJ also failed to cite Dr. Newman's testimony that a back brace might provide relief for Ms. Herron during the day in lieu of taking Flexeril – although the testimony was unclear as to whether the back brace was something that Dr. Newman proposed in conjunction with, or independent from, taking aspirin or Tylenol (R. 333). In any event, Dr. Newman noted that the medical record showed that an abdominal condition for which Ms. Herron is treated might make use of a brace difficult (R. 333-36).

to the conclusion and is thus analytically inadequate – in a word, unreasoned – we cannot uphold his decision"). *See generally, Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (ALJ must minimally articulate evidence relied on so court can trace path of reasoning).

For these reasons, the Court orders a remand for purposes of further consideration of the proper RFC for Ms. Herron.[5]

## IV.

Because a remand is required for further consideration of the proper RFC for Ms. Herron, we need not address whether the ALJ's finding at Step 5 (that there are substantial numbers of jobs in the economy that Ms. Herron can perform) is supported by substantial evidence. Nonetheless, we are troubled by certain aspects of the VE's testimony and the ALJ's determinations at Step 5. Accordingly, in order to provide guidance on remand, we make the following observations.

*First*, the ALJ found that there were a significant number of receptionists jobs (1,500) in the Chicago-metropolitan area that Ms. Herron could perform (R. 25). That finding clearly was unsupported by substantial evidence, as the Commissioner now concedes (Def.'s Mem. at 13). The VE testified to the number of information clerk, parking lot cashier, and counter and rental clerk jobs in the car rental industry that were available in the Chicago-metropolitan area (R. 345) – but provided no numbers as to the number of receptionist jobs available. At various points in his testimony, the VE made reference to information clerk and bill collector jobs in conjunction with the job of receptionist (see R. 343, 344). But, it cannot be argued that the ALJ meant information clerk job when he referred to receptionist job in his findings, because the DICTIONARY OF

_____

[5]Because of this determination, the Court does not address Ms. Herron's other arguments concerning the ALJ's credibility findings in the ALJ's reliance on the testimony of the medical experts instead of the opinion of Ms. Herron's treating physician. Given the remand, of course, those matters are open for fresh consideration by the ALJ.

OCCUPATIONAL TITLES ("DOT") issued by the Department of Labor defines those positions differently even though they belong to the same category of jobs. *See*, DICTIONARY OF OCCUPATIONAL TITLES, U.S. Department of Labor, 4th Ed., Revised 1991, Appendix C, at 207.

*Second,* even if the ALJ meant "information clerk" when he said "receptionist," the problem is that the VE's testimony that Ms. Herron (with a light duty RFC) could perform the work of an information clerk is at odds with the DOT, and with Social Security Rulings indicating that the position of information clerk is a semi-skilled job that someone with Ms. Herron's background and education could not perform with a tenth grade education. *See Id.* at pp. 1009-1012 (explaining specific vocational time for prior work skills and significance of education with respect to particular jobs.

*Third,* as to the other jobs identified by the VE as available in the economy and that Ms. Herron could perform, a Social Security Ruling indicates that the job of a counter rental clerk may require a skill level that exceeds Ms. Herron's abilities. SSR00-4p provides that semi-skilled work corresponds to a specific vocational preparation time ("SVP") of 3-4, with any number less than that corresponding to unskilled work. The DICTIONARY OF OCCUPATIONAL TITLES identifies parking lot cashier jobs of having SVPs of 2 (making them unskilled) *id.* at 183, but counter and information rental clerk jobs having an SVP of 4 (making them semi-skilled). *Id.* at 207.

On remand, errors of the type described above must be avoided.

## CONCLUSION

In remanding this case, the Court does not foreclose the possibility that the ALJ might properly find that the plaintiff is not disabled. However, that is not a conclusion that this Court can say is supported by substantial evidence based on the ALJ's explanation of his decision. We are

mindful that the Court need not remand on the basis of technical errors, in a quest for more perfect opinion, where such a remand inevitably would lead to the same result. *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989). But the matters described above are not mere technical errors, or errors on minor points: they are serious shortcomings that implicate critical findings at Step 4 and 5. In these circumstances, a remand is fully appropriate.

Accordingly, IT IS THEREFORE ORDERED that Ms. Herron's motion for summary judgment be GRANTED (doc. # 28), and the Commissioner's motion for summary judgment be DENIED (doc. # 30). This case is remanded for further consideration by the ALJ in line with this opinion.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: August 26, 2003